16514

BOOKHART v. CENTRAL ELECTRIC POWER COOPERATIVE, INC.

(65 S. E. (2d) 781)

416

*Messrs. Marshall B. Williams* and *Moss & Moss,* of Orangeburg, *for Appellant,*

*Messrs. Brown & Jefferies,* of Barnwell, *Robert McC. Figg, Jr.,* of Charleston, and *T. B. Bryant,* of Orangeburg, *for Respondent,*

418

June 12, 1951.
*Per Curiam.*

This action by appellant as plaintiff was to enjoin the prosecution of a statutory proceeding by respondent to condemn for its use a right-of-way over appellant's farm and timber land for the erection and maintenance of a transmission line. It is planned to connect two of respondent's substations and over it will be conducted electric power which will be purchased from South Carolina Public Service Authority and delivered to respondent's members and customers. The local cooperative now obtains energy at wholesale from a private corporation, South Carolina Electric & Gas Company, which also supplies the inhabitants of the nearby incorporated town of Elloree. No franchise right of that company is involved.

Light upon the controversy is afforded by reference to *South Carolina Electric & Gas Co. v. South Carolina Public Service Authority,* 215 S. C. 193, 54 S. E. (2d) 777. That case was an unsuccessful effort by the named plaintiff power company and others to prevent the construction of the transmission lines for one of which Central Electric Power Cooperative, Inc., now seeks a right-of-way over appellant's property. Central Electric was, in effect, an unnamed party to the cited action, just as S. C. Public Service Authority is for all practical purposes an unnamed party to the present action. The former decision largely fore-ordained this.

The instant appeal is from the judgment of the Circuit Court whereby temporary injunction was dissolved and injunction *pendente lite* refused. The pleadings and counter affidavits were considered by the lower Court and have been here, for the purpose of ascertaining the facts and legal positions of the parties.

Appellant's main contentions are that the attempted exercise of the power of eminent domain is in violation of the State and Federal constitutions because (1) the use to which the property is proposed to be put is private rather than public, and (2) there is no *prima facie* showing of reasonable necessity for the taking.

Is the transmission of electric power by respondent a public purpose? It was said of respondent in *South Carolina Electric & Gas Co. v. South Carolina Public Service Authority, supra,* 215 S. C. at page 199, 54 S. E. (2d) at page 779, as follows: "Central Electric Power Cooperative, Inc., is a cooperative membership corporation, formed under the Rural Electric Cooperative Act of 1939 (now Sections 8555-91 to 8555-123 of the Code) for the purpose of supplying, etc., electricity in rural areas and exempt from all control of the Public Service Commission. Central Electric is nominally sponsored by fourteen cooperative membership corporations which have distribution systems, financed by the Rural Electrification Administration of the United States, in sections of the State in which the plaintiff power companies are also engaged in business. It was formed to borrow funds from the federal Rural Electrification Administration for the cost of construction of a transmission system for operation and ultimate ownership by the defendant (S. C. Public Service Auth.)." It appears from the present record that respondent now has, instead of the then fourteen cooperative components, seventeen such subsidiary cooperatives.

"No cases deny that the right of eminent domain may be lawfully exercised for use in producing and furnishing electricity * * * and for distribution to the inhabitants for lighting their homes and places of business." 18 Am. Jur. 694, Eminent Domain, sec. 66. "The power of eminent domain usually is conferred by the legislature on electric light and power companies, see *supra* § 24, and the erection, maintenance and operation of plants for generating electricity and distributing the same to the public for light, heat, or power ordinarily is regarded as a public use for which private property may be appropriated." 29 C. J. S., Eminent Domain, § 58, page 845.

Reference to the enabling act under which respondent was created is necessary. Code sec. 8555-93 contains a lengthy enumeration of the powers of a "Cooperative," which re-

spondent is. These express powers include: "(d) To generate, manufacture, purchase, acquire, accumulate and transmit electric energy, and to distribute, sell, supply and dispose of electric energy in rural areas to its members, to governmental agencies and political subdivisions and to other persons not in excess of ten per centum (10%) of the number of its members; * * * (1) To exercise the power of eminent domain in the manner provided by the laws of this State for the exercise of that power by corporations constructing or operating electric transmission and distribution lines or systems; * * * (o) To do and perform any and all other acts and things, and to have and exercise any and all other powers which may be necessary, convenient or appropriate to accomplish the purpose for which the cooperative is organized."

The intended nature and purpose of respondent is further evidenced by section 8555-119 by which cooperatives are exempt from all jurisdiction and control of the Public Service Commission of the State. If not public, the exemption was unnecessary, and the grant of the power of eminent domain of course improper. The purpose of a "cooperative" was defined in an opening section of the act, now No. 8552-92 of the Code, as follows: "Cooperative, non-profit, membership corporations may be organized under this chapter for the purpose of supplying electric energy and promoting and extending the use thereof in rural areas."

The foregoing legislative expressions leave no doubt of the intention to make of the cooperatives public service corporations. As pointed out in the judgment under review, the need of available electric energy in rural, farm areas, of which this State is chiefly composed, was compelling and the great progress by which it has been met since the passage of the law is common knowledge. Here the record indicates that the town of Elloree and some of its environs are supplied with electricity by a private company but the rural areas thereabout are largely dependent upon a cooperative. Appellant contends that the unit cost will be

greater for the power which will be furnished by the Authority than that now purchased from the private company, but the Court has nothing to do with that in this litigation.

Appellant lays stress in argument upon sub-section (d), which is quoted above and provides that the service by cooperatives is limited to their members, governmental agencies and subdivisions and other persons not in excess of ten per cent of the number of members; and a clause in Code section 8555-98, as follows: "The by-laws (of the cooperative) may prescribe additional qualifications and limitations in respect of membership." This contention was well answered in the circuit judgment in the following language: "Implicit in the purpose for which cooperatives are authorized by the Act, that 'of supplying electric energy and promoting and extending the use thereof in rural areas,' is the obligation of such corporations to make membership available, without arbitrary or unreasonable limitations thereon, to all coming within the purview of that purpose. It cannot properly be assumed that a cooperative will unreasonably depart from the purpose of its creation and it would be pre-judging that question to decide it before it arises. *Cf. McMeekin v. Central Carolina Power Co.*, 80 S. C. 512, 518, 61 S. E. 1020, 128 Am. St. Rep. 885." See also, *Augusta Power Co. v. Savannah River Electric Co.*, 163 S. C. 541, 161 S. E. 767, 163 S. E. 822.

Universality of patronage of a public utility is not essential to "public use" of its property. The public use and the right to condemn land for an electric transmission line are not affected by the fact that many persons in the community proposed to be served are not interested in or desirous of using electric current. *Webb v. Knox County Transmission Co.*, 1920, 143 Tenn. 423, 225 S. W. 1046. A power company may serve a public use, though not compelled or intending to furnish current to scattered customers along its high-tension transmission lines unless it would be remunerative to install the necessary transformers. *Webb v. Knox County Transmission Co.*, *supra*, wherein

the court said: "In furnishing electricity, it is not possible to construct lines and facilities, so as to deliver electric current to every person who may reside along the line, because it requires large outlays of moneys to construct a transforming or reducing station at any point on the line for the purpose of delivering electricity at such point, and in view of these requirements it is the purpose of petitioner · * * * to furnish electricity to any customer or customers, where the necessary construction for that purpose would be justified. * * * We do not think it necessary that every inhabitant of the community shall be benefited by the use which it is proposed to be made of the lands taken, in order to constitute a public one." 44 A. L. R. 736.

By a simpler concept which seems sound and applicable the same result is reached with respect to the curious wording of the provision of the law which relates to "membership." It is that the customers, which are called "members," of the cooperatives are in the territories of their operation the "public" which must be reasonably served, and to whom the service must be available on equal terms, in order to satisfy the undoubted rule that the power to condemn can only be delegated for, at least principally, a public use. There is no "public" which is separable from the members in the rural areas where the cooperatives do business; and they at once take the place of the stockholders *and* customers of privately owned utilities; they are both owners and customers, and that makes difficult at first the relation to this new situation of decisions affecting privately owned utilities. It is an example of the application of time-tested legal principles to a new factual situation.

We follow the intention of the General Assembly, which is manifest from the terms of the enabling act, that respondent is public in its nature and purpose, with the expressly delegated power of eminent domain, which inevitably results in the obligation to reasonably render nondiscriminatory service. That affords protection to the public, including applicants for membership, from arbi-

trary action by way of exclusion from membership or otherwise. This view is consistent with the legislative definition of public utility which was included in Act No. 525 of 1922, 32 Stat. 938, as follows: "every corporaton and person furnishing or supplying in any manner gas, electricity, heat, electric power, water and street railway service, or any of them, to the public or any portion thereof, for compensation. The term 'Public or any portion thereof' as used herein, means the public generally, or any limited portion of the public, including a person, private corporation, municipality, or any political subdivision of the State". The definition is retained in the current Code of 1942, sec. 8209.

The following is from the opinion in *Riley v. Charleston Union Station Co.,* 71 S. C. 457, 51 S. E. 485, 495, 110 Am. St. Rep. 579, in which it was unsuccessfully contended that a site for a railroad union terminal would not be devoted to a public use and therefore could not be condemned: "The first general principle which must control this question is, when the Legislature, in effect, declares that the construction, maintenance, and operation of the union passenger station in the city of Charleston is a public purpose, so as to authorize the condemnation of property, this conclusion is binding on the court, if there be any reasonable ground to support it." There is a strong statement of this rule in 29 C. J. S., Eminent Domain, § 30, page 820, as follows: "Unless otherwise controlled by constitutional regulations, it is for the legislature to determine, in the first instance, the question whether the use for which it is proposed to condemn property is a public use."

Exemption from jurisdiction of the Public Service Commission does not free the cooperatives from rate and other regulations. They may be subjected to legislation. "The rates and charges for electrical service supplied as a public utility are subject to public regulation. Such regulation is a proper exercise of the police power, provided it does not violate constitutional limitations or restrictions. This power may be exercised directly by the legislature, or

indirectly through municipal corporations, boards, commissions, or other governmental bodies and agencies, to which the power has been lawfully delegated." 29 C. J. S., Electricity, § 30, page 553. In that aspect respondent is like the Public Service Authority which we have held to be exempt from the jurisdiction of the Public Service Commission. *South Carolina Electric & Gas Co. v. South Carolina Public Service Authority, supra,* 215 S. C. 193, 54 S. E. (2d) 777.

The foundation of appellant's interesting legal argument is the authority of *Fallsburg Power & Mfg. Co. v. Alexander,* 101 Va. 98, 43 S. E. 194, 195, 61 L. R. A., 129, 99 Am. St. Rep. 855. In that leading case delegation by the legislature of the power of eminent domain to a private corporation was held invalid because the use to which the contemplated works were to be put was at least predominantly private, rather than public. The court defined the purpose, derived from the legislative charter, as follows: "In other words, the purpose is to acquire by condemnation so much of the lands and water rights of defendants in error as may be needed by the company to enable it to locate and establish its plant or plants for the 'manufacture and generation of water power, electrical power, or other power, light or heat, to be utilized, transmitted and distributed to any place or places for the company's use, or for the use of other individuals or corporations.' " Interestingly enough, the court concluded its opinion with the following language: "To meet industrial progress, new conditions, and the ever-increasing necessities of society, the courts have gone very far in sustaining legislation conferring the franchise of eminent domain, and it is not necessary for us in this case, if we were so inclined, to question the soundness of the policy sustained in those decisions."

About a quarter century later the same highly respected Virginia Court decided *Nichols v. Central Virginia Power Co.,* 143 Va. 405, 130 S. E. 764, 44 A. L. R. 727, which is the subject of an annotation beginning at 44 A. L. R. 735,

entitled, "Furnishing electricity to public as public use or purpose for which power of eminent domain may be exercised." There is similarity between the facts of that case and this because the right of condemnation was vainly challenged with respect to right-of-way for a transmission line between cities whereby electricity would be procured at substations for transmission, sale or distribution. The court differentiated the earlier *Fallsburg case, supra,* as follows: "The gist of the holding was that the charter of the Fallsburg Company conferred upon it the right to withdraw from the public use its entire manufactured products and appropriate the same to its own use or benefit. This, of course, was held to be illegal, as the private benefit clearly dominated the public interest." In the appended annotation a great many decisions are cited, including cases from this court, to sustain the following generalization: "The generation and transmission of electricity for the purposes of furnishing light, heat, or power on equal terms to all within the range of service, is a public use for which the power of eminent domain may be exercised."

Rural electrification as it is now known appears to have made its advent about 1935 and was accelerated upon passage of legislation by Congress in 1936 whereby Federal construction loans were authorized to cooperatives in the States. 7 U. S. C. A. §§ 901-914. Consequently, reported cases affecting them are few compared to the myriad of decisions relating to privately owned electrical utilities. A few were cited in argument and more have been found. They show that the courts and public service commissions of other States have sharply differed in their conclusions with respect to whether rural electric cooperative organizations, similar to respondent here and likewise formed to fit the Federal aid act, are subject to rate and other regulation by the respective State regulatory bodies. Court decisions and commission holdings are collected in an annotation in 132 A. L. R. 1495, 1504. Among the later decisions which are not included in the annotation is *Carolina Power & Light*

*Co. v. Johnston County Electric Membership Corp.,* 211 N. C. 717, 192 S. E. 105, which held a cooperative not so subject because the enabling act was complete in itself. That is not materially different from the situation in this State; the result is the same, and the particular question annotated at 132 A. L. R. 1504 is obviated here, by reason of the provision of our Act, Code sec. 8555-119, that a cooperative is not subject to such jurisdiction. However, appellant relies upon the several foreign decisions noted in the annotation which hold that the cooperatives are not subject to public regulation because they are private rather than public. We do not think it logical to so conclude in our case. On the contrary, the terms of our law to which references have been made and others, including the partial exemption from taxes, Code sec. 8555-118, plainly bespeak the legislative intention to make them public corporations and their use and function public, rather than private.

A leading case of similar import and result to this is *Alabama Power Co. v. Cullman County Electric Membership Corp.,* 234 Ala. 396, 174 So. 866, 869. The following are pertinent excerpts from the opinion: "In conferring the general right of eminent domain, the legislature must be given credit for intending not to violate section 23, Constitution, by conferring such power on a corporation, not municipal, for private use. *Harvey v. Warren,* 212 Ala. 415, 102 So. 899; *Mt. Vernon-Woodberry Cotton [Duck] Co. v. Alabama Interstate [Power] Co.,* 240 U. S. 30, 36 S. Ct. 234, 60 L. Ed. 507; 20 Corpus Juris 548, §35. * * *

"It is contemplated in both (a municipal corporation and that in hand—interpolated) that all the inhabitants in the described territory shall be eligible to obtain the service by complying with the reasonable conditions. So that they are both serving and constituted to serve the public in that area —an essential element of a utility. *State ex rel. Wood v. Consumers' Gas Trust Co.,* 157 Ind. 345, 61 N. E. 674, 55 L. R. A. 245. * * * The Legislature has set up authority for a corporation and affected it with a public in-

terest, and has control over it by present and future legislation such as ordinarily is applicable to a utility, and has given it those qualities which the Code provisions and general principles define as constituting a utility.

"From the fact that appellee is a utility, appellant passes easily to the conclusion that it is operating illegally, since it has no certificate of convenience and necessity under section 9795, Code. But we think that the act contains every internal evidence of an intention to exempt a corporation so organized from all regulatory requirements not prescribed for it in the act itself. It shows an intention to make the act cover the whole field of regulation which should apply at the present time. * * * All the cases we have seen justify the Legislature in classifying separately mutual co-operative organizations and corporations created not for profit making but for co-operative benefits to its members, and doing business in the main with its members, so as to exempt them from the operation of laws applicable to enterprises conducted for making a return on their invested capital.

"The cases cited by appellant in which it is held that co-operative utility companies are subject to the general utility laws are where there was no statute making a different classification for them. When that is done, we cannot say that there is no reasonable basis for it." This court has recognized the validity of classification of cooperatives for other purposes. *South Carolina Cotton Growers' Cooperative Ass'n v. English,* 135 S. C. 19, 133 S. E. 542.

Parenthetically we note that it was in the above cited case of *Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co.* that Mr. Justice Holmes employed the following eloquent and oft-quoted language, 36 S. Ct. at page 236: "The principal argument presented that is open here, is that the purpose of the condemnation is not a public one. The purpose of the Power Company's incorporation, and that for which it seeks to condemn property of the plaintiff in error, is to manufacture, supply, and sell to the public.

power produced by water as a motive force. In the organic relations of modern society it may sometimes be hard to draw the line that is supposed to limit the authority of the legislature to exercise or delegate the power of eminent domain. But to gather the streams from waste and to draw from them energy, labor without brains, and so to save mankind from toil that it can be spared, is to supply what, next to intellect, is the very foundation of all our achievements and all our welfare. If that purpose is not public, we should be at a loss to say what is. The inadequacy of use by the general public as a universal test is established. *Clark v. Nash,* 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171; *Strickley v. Highland Boy Gold Min. Co.,* 200 U. S. 527, 531, 26 S. Ct. 301, 50 L. Ed. 581, 583, 4 Ann. Cas. 1174."

The Supreme Court of Indiana cited and followed *Alabama Power Co. v. Cullman County Electric Membership Corp., supra,* in *Kosciusko County Rural Electric Membership Corporation v. Public Service Commission,* 1948, 225 Ind. 666, 77 N. E. (2d) 572, 577, and squarely held a cooperative to be a public utility principally because its powers could not have been conferred by the legislature for private use, and said, as we in effect say here, that it is not necessary to hold that under the enabling legislation a cooperative may adopt unreasonable by-laws as to membership. Finally the Court said in the opinion: "We recognize * * * that the authorities are not uniform * * * . We think that the better reasoning is, and so hold, that REMC (the cooperative) and all like corporations are public utilities." The most exhaustive and most valuable opinion upon the question of the public nature of a rural electric cooperative which has come to our attention is *Rural Electric Co. v. State Board of Equalization,* 57 Wyo. 451, 120 P. (2d) 741, rehearing denied, 122 P. (2d) 189. In it all of the earlier authorities to which we have referred were reviewed, as were statutes and public service commission action of many States. The conclusion of the Court was that a coop-

erative is a public utility despite the membership feature. The Supreme Court of Georgia very recently made short shrift of the immediate question in hand in *Hagans v. Excelsior Electric Membership Corporation,* 207 Ga. 53, 60 S. E. (2d) 162, where a rural electric membership corporation, like respondent here, was held to have the right to condemn a right-of-way over private property, apparently to transmit power to a single member at his fishing camp or pleasure resort. The power of eminent domain had been delegated to the subject cooperative and others similar by express legislative enactment, also as here.

It is not novel to exempt a publicly owned utility from regulation by the Public Service Commission. Sec. 8555, Code of 1942, does that with respect to municipally owned electrical utilities as to business done within the municipality. The justification and validity of such legislation was discussed and decided in the leading case of *Springfield Gas & Electric Co. v. City of Springfield,* 292 Ill. 236, 126 N. E. 739, 18 A. L. R. 929, affirmed, 257 U. S. 66, 42 S. Ct. 24, 66 L. Ed. 131. Other authorities to like effect are digested is the annotation in 18 A. L. R. 946. The reasons for the rule are similarly applicable to a cooperative.

The principal question presented by the appeal has been fully considered and hereinabove discussed as if an open one in this Court, because of the earnestness with which the case has been contested and argued by the able counsel for appellant. However, it is hardly so under our former decisions. Before passage of the Rural Electric Cooperative Act of 1939, now sections 8555-91 *et seq.* of the Code of 1942, relevant here and reviewed in the foregoing, the State had embarked upon rural electrification and enacted the State Rural Electrification Authority Act of 1935, Code sections 8555-61 *et seq.* The change of policy from State authority to cooperatives was effected by Act No. 1030 of 1940, 41 Stat. 2059, entitled: "An Act Providing for the Transfer to Cooperatives of Electric Lines of the State Rural Electrifi-

cation Authority and Prescribing the Procedure Therefor and the Effect Thereof." Section 2 of the act was as follows: "It is hereby determined and declared to be the policy of the General Assembly of South Carolina that the furnishing of electric service to persons in rural areas of this State can be more effectively promoted and accomplished by Cooperaties than by the Authority." Construction of the Act was involved in *Woodward v. State Rural Electrification Authority,* 190 S. C. 465, 3 S. E. (2d) 539, and *Crews v. Beattie,* 197 S. C. 32, 14 S. E. (2d) 351. Meanwhile and when the policy of State administration of rural electrification was in force there arose the case of *Lay v. State Rural Electrification Authority,* 182 S. C. 32, 188 S. E. 368, 369, which involved contest of the statutory right of the State Authority to construct transmission lines on and along public highways, to which an abutting owner objected and attempted to enjoin. In part reason for rejection of the plaintiff-landowner's contention the Court decided and said: "It is conceded in the pleadings and established by the Rural Electrification Act that the purposes of the Acts is manifest upon even private purpose." The similarity of the purposes of the Acts is manifest upon even casual reading of them.

Appellant attacked in argument the authority of *Boyd v. Winnsboro Granite Co.,* 66 S. C. 433, 45 S. E. 10, and with the criticism we are inclined to agree. However, the statement of the rule there was tempered in the subsequent decision of *Riley v. Charleston Union Station Co., supra,* 71 S. C. 457, 51 S. E. 485, 110 Am. St. Rep. 579, which was a well-considered case, and the apparently generally abandoned theory of "public benefit" as justifying the exercise of the power of eminent domain was not followed; nor do we need to follow it here if we were so disposed. Public benefit and public use are not synonymous in the better and more clearly constitutional view. We think that the latter (public use) is necessary for the constitutional exercise of the power of eminent domain.

Turning to the other points, which were rather perfunctorily presented, *prima facie* necessity for right-of-way over the land is established and the notice of condemnation was as definite as appellant's hostile conduct permitted. We affirm the following conclusions thereabout from the order of the Circuit Court: "The location of the line on the ground has not yet been definitely laid out by a survey because the plaintiff has refused the defendant's representatives access to the lands for such purpose. Economic and engineering considerations require such lines to be constructed as nearly straight as practicable, and there is no other feasible route for the line except the route across the lands in question, because any other route would increase the length of the line by several miles, and the cost would be substantially increased by reason of the additional guy wires, anchors and appropriate structures which would be necessitated at each of four additional angles." The factual issues of the necessity is for trial by the Court, an impartial tribunal, which satisfies the State and Federal constitutional requirements of due process of law and affords equal protection of the law.

Finally, appellant's contention that the Rural Electric Cooperative Act of 1939, now secs. 8555-91 *et seq.* of the Code, is unconstitutional because it is a special instead of a general law, Sec. 34 of Art. III of the State Constitution, is entirely untenable. The law is of application throughout the State and we think like the lower Court that only the converse authority of *State v. Hammond,* 66 S. C. 219, 44 S. E. 797, need be cited. The classification of cooperatives was within the legislative power, as seen above.

As stated at the outset the appeal in hand is from an order of denial of injunction *pendente lite.* The rule is well recognized in this State that an interlocutory injunction will not be granted except under the circumstances stated in the case of *Childs v. City of Columbia,* 87 S. C. 566, 70 S. E. 296, 297, 34 L. R. A., N. S. 542: "The right to an injunction does not arise merely because the

plaintiff asks for injunction and nothing ·more, nor because the plaintiff alleges that without the injunction he would suffer irreparable injury. This results from the truism that all judicial action is taken on the conviction of the judge as to the rights of the parties, and· not on the opinion of the parties themselves as to their rights. Hence there are two essential conditions to the granting of even temporary injunctions: First, the complaint must allege facts which appear to be sufficient to constitute a cause of action for injunction; and, second, on the entire showing from both sides it must appear, in view of all the circumstances, that the injunction is reasonably necessary to protect the legal rights of the plaintiff pending the litigation. *Alderman [& Sons Co.] v. Wilson,* 69 S. C. [156] 159, 48 S. E. 85; *Northrop v. Simpson,* 69 S. C. [551] 554, 48 S. E. 613; *Marion C[ounty] L[umber] Co. v. Tilghman L[umber] Co.,* 75 S. C [220] 221, 55 S. E. 337; *Boyd v. Trexler,* 84 S. C. 51, 65 S. E. 936; *Kelly v. Tiner,* 86 S. C. 160, 68 S. E.465." *Twin City Power Co. v. Savannah River Electric Co.,* 163 S. C. 438, 466, 161 S. E. 750.

*Seabrook v. Carolina Power & Light Co.,* 159 S. C. 1, 156 S. E. 1, is clearly differentiated by its facts. Appellant has made no such showing as the landowner did there.

No error is found and the order under appeal is affirmed.

BAKER, C. J., and FISHBURNE, STUKES, TAYLOR, and OXNER, JJ., concur.